UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FREDDIE WILLIAMS, JR.,

       Plaintiff,

v.                                                              Case No. 04-71064
                                                                Case No. 04-71841

DETROIT BOARD OF EDUCATION,
KENNETH BURNLEY, LAVONNE                    Honorable Patrick J. Duggan
SHEFFIELD, AND JOHN DOES I AND II,

       Defendants.

_____/


## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District of
Michigan, on September 9, 2005.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Plaintiff Freddie Williams, Jr. ("Plaintiff") filed these consolidated lawsuits after

Defendants terminated him as principal of Trombly Alternative High School ("Trombly")

in January 2002, and allegedly forced him to retire from his position as a tenured teacher

in April 2002. In both lawsuits, Plaintiff alleges that Defendants violated federal and

state law by disseminating the results of a school audit purportedly showing that he

misappropriated public school funds and equipment for his own benefit. Defendants are

1

the Detroit Public Schools Board of Education ("Board"), former Detroit Public Schools'

Chief Executive Officer Kenneth Burnley ("Dr. Burnley"), former Detroit Public

Schools' Chief of Staff LaVonne Sheffield ("Dr. Sheffield"), and two unknown

employees of the Board.  Presently before the Court is Defendants' motion for summary

judgment.  The Court held a hearing on Defendants' motion on August 18, 2005.

## I.    Plaintiff's Claims[1]

In these lawsuits, Plaintiff sets forth the following claims: denial of procedural due

process in violation of 42 U.S.C. § 1983 (**Count I**); "§ 1983 Claim"[2] (**Count II**); denial

of substantive due process[3] (**Count III**); infringement of Fifth and Fourteenth

Amendment liberty interest (**Count IV**)(Count I); violation of the duty to conduct a fair

investigation prior to termination set forth in Article I, Section 17 of Michigan's

Constitution (**Count IV**)[4](Count II); defamation (**Count V**); intentional infliction of

---

[1]The counts in bold type are the counts in Case Number 04-71064; the counts in regular type are the counts in Case Number 04-71841.

[2]In Count II, Plaintiff claims Defendants deprived him of his XIV Amendment liberty interest by failing to provide "a meaningful opportunity for a hearing to clear his name." *See* Compl. ¶¶ 70-71.

[3]While it appears Plaintiff is claiming in this count that he possesses a fundamental liberty interest "in his good name and reputation," he refers to these interests only as property or liberty interest[s] protected by due process. *See* Compl. ¶ 75. The Court also is not certain that Plaintiff is alleging a violation of his "substantive due process" rights in this count as his allegations focus on the procedures Defendants provided prior to his "summar[y[ discharge," claiming the "procedures used to terminate [him] were unfair, heavily biased in Defendant's favor, and denied him a meaningful opportunity to defend himself . . ." *See* Compl. ¶¶ 76-77.

[4]In his complaint and amended complaint in Case Number 04-71064, Plaintiff labels two counts "Count IV."

emotional distress (**Count VI**)(Count III); "42 U.S.C. § 1983"[5] (**Count VII**); infringement of liberty interest in good name and reputation (**Count VIII**)(Count IV); retaliatory termination in violation of the First Amendment (**Count IX**)(Count V); constructive discharge (**Count X**)(Count VI); and wrongful discharge (**Count XI**)(Count VII).

## II.    Factual Background

Plaintiff was employed by the Detroit Public Schools, first as a teacher commencing in May 1978, and then as a school administrator at various locations commencing in 1993.  In 1997, Plaintiff became principal at Trombly.

Beginning in early 2000, the Board began receiving complaints about Plaintiff. Specifically, individuals reported that Plaintiff was misappropriating school district funds and equipment.  Around March 30, 2001, the school district initiated an audit of Trombly to investigate the allegations against Plaintiff.  Patricia Adams, then Director of the Detroit Public School's Internal Audit Department, conducted the audit.

On May 18, 2001, the first draft of the audit report was complete.  *See* Mot. Ex. 16.  In this report, the school district identified a number of irregularities at Trombly related to Plaintiff.  *See id.*  Sometime in May 2001, Plaintiff attended a meeting of Detroit Public School principals in order to voice his opposition to Dr. Burnley's administration.  On June 18, 2001, the Executive Director of the school district's Human

_____

[5]In Count VII, Plaintiff claims Defendants violated his due process and equal protection rights prior to termination of his property interest in continued employment.  *See* Compl. ¶¶ 109-112.  Although Plaintiffs refers to the Equal Protection Clause, he does not allege, argue, or set forth any facts to support an equal protection violation.

Resources Department, Lynne Metty, notified Plaintiff that he was being placed on administrative leave with pay.

Thereafter, Patricia Adams left the Internal Audit Department and Angela Taylor took over as the Department's Director.  Taylor assigned staff to complete the Trombly audit.  *See* Mot. Ex. 11 at 26-27.  On three dates in the early and late Fall of 2001, Taylor and/or her staff met with Plaintiff and his attorney to discuss the allegations in the draft audit report.  *See id.* at 43; Ex. 1 at 56-64.  Following the last meeting, the audit report was revised to add Plaintiff's opinion.  *See id.* Ex. 21.  On December 18, 2001, the day after the audit report was revised, the Detroit News published an article about Plaintiff which described the conclusions set forth in the audit investigation report about his misdeeds.  *See id.* Ex. 1 at 92-96.

On January 4, 2002, the auditors released another revised audit report.  *See id.* Ex. 21.  A week later, Defendant Dr. Sheffield sent Plaintiff a letter advising him of a hearing scheduled for January 18, 2002, regarding disciplinary charges being brought against him in his position as principal based on the findings in the audit report.  *See id.* Ex. 30.  The letter set forth the specific disciplinary charges alleged against Plaintiff, advised Plaintiff that he would have the opportunity to present any explanation or relevant evidence at the hearing, and indicated that Plaintiff could bring one representative– including an attorney– to the hearing.  *See id.*  The letter further stated that the disciplinary charges would be presented to the district's Deputy Chief Executive Officer ("CEO") David Lister at the hearing and that Mr. Lister then would determine Plaintiff's fitness and ability to serve as a principal and what, if any, sanctions should be imposed against him.

4

*See id.*  Plaintiff was advised that disciplinary action could include termination of his employment as a principal for the Detroit Public Schools.  *See id.*

On January 18, Plaintiff attended the scheduled hearing with his attorney, Michael C. Hechtman.  *See* Mot. Ex. 31.  Also present at the meeting were Mr. Lister, Ms. Taylor, an attorney representing the school district, and a secretary to take notes.  *See id.*  Mr. Hechtman spoke for Plaintiff at the meeting.  *See id.*  Mr. Hechtman indicated that Plaintiff would not respond to any of the charges at the meeting or in writing because he believed he had not been provided with documents still located at Trombly that he believed were necessary to respond to the charges against him.  *See id.*; Ex. 1 at 374-78. Ms. Taylor countered that she met with Plaintiff and Mr. Hechtman on three occasions during the audit process and produced documents when requested.  *See id.* Ex. 31.

On January 23, 2002, Mr. Lister sent a memorandum to Dr. Burnley recommending that Plaintiff be terminated as a principal.  *See id.* The following day, Dr. Burnley accepted and approved Mr. Lister's recommendation.  *See id.* Sometime in March 2002, Plaintiff received a letter stating that he was being terminated as a principal and suspended as a teacher pending a decision by the Board as to whether it would file charges against him with the Teacher Tenure Commission.  *See id.* Ex. 1 at 72-74.

On March 25, 2002, Dr. Sheffield sent Plaintiff a letter stating that the Board had decided to take the charges to the Teacher Tenure Commission and that a hearing regarding the Board's decision was scheduled for April 4, 2002.  *See id.* Ex. 32.  Dr. Sheffield outlined the charges being brought against Plaintiff and informed Plaintiff that the purpose of the meeting was for the school district's CEO to determine whether or not

5

to proceed upon the charges or to modify the charges.  *See id.*  The letter set forth

Plaintiff's rights if the CEO or his designee decided to proceed on the charges:

> You will be provided with a copy of the [CEO's], or his
> designee's written decision to proceed on the charges, a
> written statement of the charge or charges and their outcome,
> and a statement of your rights under the Michigan Teacher
> Tenure Act.  You are entitled to a full evidentiary hearing
> before the State of Michigan Teacher Tenure Commission to
> contest the [CEO's] or his designee's decision to proceed
> upon the charge or charges.

*See id.*

The April 4 hearing subsequently was postponed at Plaintiff's request until April

15, 2002.  On April 11, Plaintiff requested a private, rather than public, hearing.  *See id.*

Ex. 33.  At the hearing on April 15, Plaintiff was informed that the Board was going to

pursue charges against him with the Teacher Tenure Commission.  *See id.* Ex. 1 at 75-76.

On April 16, 2002, Lynne Metty sent Plaintiff a letter informing him of her decision to

pursue the charges with the Teacher Tenure Commission.  *See id.* Ex. 34.  Ms. Metty also

enclosed a copy of Article IV, Sections 38.101-105 of the Michigan Teacher Tenure Act

which set forth Plaintiff's due process rights.  *See id.*  Ms. Metty informed Plaintiff that

he could contest the charges by filing a claim of appeal with the Teacher Tenure

Commission within 20 days after receipt of the letter.  *See id.*

On May 6, 2002, Plaintiff appealed the Board's decision to proceed with charges

under the Teacher Tenure Act.  *See id.* Ex. 35.  The case was scheduled to go before an

Administrative Law Judge beginning July 24, 2002.  Before that date, pursuant to a

stipulation with the school district, Plaintiff decided to voluntarily retire.  *See id.* Ex. 36.

Plaintiff retired from his position as a teacher, effective August 2002.  *See id.* Ex. 1 at 77.

## III.    Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323.  Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255.  The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant."  *See id.*

7

IV.     **Applicable Law and Analysis**

A.      **Violation of Plaintiff's Procedural Due Process Rights**

The Fourteenth Amendment forbids state actors from depriving "any person of life, liberty, or property, without due process of law."  U.S. CONST. Amen. XIV; *see also Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002).  To establish a procedural due process violation, a plaintiff must prove that (1) he was deprived of a liberty or property interest and (2) the procedures afforded to protect that interest were insufficient.  *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 971 (6th Cir. 2004).  In his procedural due process claims, Plaintiff asserts a liberty or property interest in his position as principal, his position as a teacher, and his good name and reputation.

1.      **Good name and reputation**

"'A person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment.'"  *Quinn*, 293 F.3d at 319 (quoting *Chilingirian v. Boris*, 882 F.2d 200, 205 (6th Cir. 1989)).  However, as the Sixth Circuit has explained, defamation alone will not invoke due process concerns.  *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 711-12, 96 S. Ct. 1155, 1165-66 (1976)).  "Some alteration of a right or status 'previously recognized by state law,' such as employment, must accompany the damage to reputation."  *Id.*; *see also Ferencz v. Hairston*, 119 F.3d 1244, 1249 (6th Cir. 1997)(holding that publication of defamatory comments did not deny the plaintiff of a liberty interest since publication was not accompanied by the deprivation of any tangible interest such as continued employment).  Thus due process concerns may be implicated when a defendant makes a voluntary,

8

public dissemination of false information about the plaintiff in the course of the

defendant's decision to terminate the plaintiff's employment. *Quinn*, 293 F.3d at 319-20

(citations omitted). In such a case, due process guarantees the Plaintiff the opportunity to

clear his or her name. *Id.* at 320.

The Sixth Circuit has identified five factors a plaintiff must establish to show that

he was deprived of a liberty interest in his good name or reputation and was entitled to a

"name-clearing" hearing:

> "First, the stigmatizing statement must be made in
> conjunction with the plaintiff's termination from employment
> . . . Second, a plaintiff is not deprived of his liberty interest
> when the employer has alleged merely improper or inadequate
> performance, incompetence, neglect or duty or malfeasance ...
> Third, the stigmatizing statements must be made public.
> Fourth, the plaintiff must claim that the charges made against
> him were false. Lastly, the public dissemination must have
> been voluntary."

*Id.* (quoting *Brown v. City of Niota*, 214 F.3d 718, 722-23 (6th Cir. 2000)). If the plaintiff

satisfies all five factors, "he is entitled to a name-clearing hearing if he requests one." *Id.*

(quoting *Brown*, 214 F.3d at 723).

A plaintiff only can establish a procedural due process violation with respect to

good name and reputation *if* he requested a name-clearing hearing *and* the defendant

denied the plaintiff such a hearing. *Id.* "It is the denial of the name-clearing hearing that

causes the deprivation of the liberty interest without due process." *Id.* Thus a plaintiff

failing to show that he requested a name-clearing hearing *and* that he was denied the

same has no cause of action, regardless of "whether or not he had been informed of a

right to a hearing before filing suit." *Id.* at 324.

A name-clearing hearing is a hearing that "affords the aggrieved employee an 'opportunity to be heard to refute the charges disseminated against him.'" *Id.* at 321 (quoting *Ludwig v. Bd. of Trustees*, 123 F.3d 404, 410 (6th Cir. 1997)). "The hearing 'need only provide an opportunity to clear one's name and need not comply with formal procedures to be valid.'" *Id.*

Even if the Court assumed in this case that Plaintiff established the five factors necessary to show that he was entitled to a name-clearing hearing, the Court finds that his procedural due process claim with respect to his good name and reputation fails. The undisputed evidence establishes that Plaintiff failed to request a name-clearing hearing before filing his lawsuits. More importantly, the undisputed evidence further establishes that Defendants in fact provided Plaintiff with such a hearing prior to his termination as principal, prior to the Board's decision whether to pursue charges with the Teacher Tenure Commission, and following the Board's decision to pursue charges and seek his termination as a teacher. In other words, Defendants afforded Plaintiff the opportunity to clear his name at public hearings.

In letters to Plaintiff, the Board scheduled various public hearings at which he would have the opportunity to refute the charges against him. *See* Defs.' Mot. Ex. 30 at 1; Ex. 32 at 4; Ex. 34. Plaintiff attended the public hearing with respect to his termination as principal but declined to refute the charges. *See id.* Ex. 31. While Plaintiff may argue that the school district failed to provide him with documents still located at Trombly that he believed were necessary to respond to the charges against him and therefore clear his name, the undisputed evidence establishes that the auditors produced documents

10

requested by Plaintiff and/or his attorney (including Trombly's financial records relied upon by the auditors to complete the final audit). *See* Mot. Ex. 31; Reply Ex. B Taylor Aff. ¶¶ 5-11, Stanley Aff. ¶¶ 6-13.  As to any documentation in Plaintiff's office at the school, the undisputed evidence establishes that his belongings were placed in boxes sometime after August 18, 2001, and that Andrea Ford-Ayler thereafter telephoned Plaintiff on at least two occasions and told him to retrieve the items.[6]  *See* Reply Ayler Aff.; Linen Aff.

With respect to the Board's decision whether to pursue charges with the Teacher Tenure Commission, Plaintiff was afforded a public hearing to respond to the charges but he instead elected a private hearing.  *See id.* Ex. 33.  Rather than invoking his right to a hearing before an Administrative Law Judge pursuant to the Teacher Tenure Act, Plaintiff decided to voluntarily retire.  *See id.* Ex. 36.  Accordingly, the Court finds no due process violation with respect to Plaintiff's liberty or property interest in his good name and reputation.

### 2.    Principal Position

Plaintiff claims that he had a property interest in his continued employment as a principal with the Detroit Public Schools.  It is well-established that a public employee does not have a property interest in continued employment when his position is held at-will.  *Chilingirian*, 882 F.2d at 203 (citing *Bishop v. Wood*, 426 U.S. 341, 96 S. Ct. 2074

---

[6]In any event, as Defendants correctly note, it was Plaintiff's responsibility as Trombley's Principal to maintain the school's financial records and it was those records on which the auditors relied to conduct their audit.

(1976) and *Lake Mich. College Fed'n of Teachers v. Lake Mich. Cmty. College*, 518 F.2d 1091 (6th Cir. 1975)).  As the *Chilingirian* court stated: "[A] public employee does not have a property interest in continued employment when his position is held at the will and pleasure of his superiors and when he has not been promised that he will only be terminated for cause."  *Id.*

Pursuant to Michigan law, "each employee of the . . . school district whose position is not covered by a collective bargaining agreement is employed at the will of the chief executive officer."  MICH. COMP. LAWS ANN. § 380.373(6).  While Plaintiff's position as a teacher was covered by a collective bargaining agreement, his position as a principal was not.  Therefore, pursuant to Section 380.373(6), he was an at-will employee.

In his response, Plaintiff asserted that he had a contract with the school district modifying the at-will relationship created by Section 380.373(6); however, he failed to attach a copy of the contract to the response.  Following the hearing, at the Court's request, Plaintiff forwarded a copy of the contract to the Court and opposing counsel.[7] Having reviewed this document, the Court is further persuaded that Plaintiff, as a principal, was an at-will employee.

Section 3 of the contract is entitled "At Will Employment" and states:

---

[7]The Court notes that the document Plaintiff has provided to the Court is signed by Plaintiff only, not the school district.  Defendants indicated at the hearing that there is no contract in Plaintiff's personnel file with respect to his position as principal, although Defendants' counsel acknowledged that it is the school district's general practice to send this document to its principals as a standard contract.

> 3.1    The School Principal, subject to the terms of this
> Agreement and applicable Michigan law, serves at the
> pleasure of the CEO.  The CEO may terminate this
> Agreement, **at his/her sole discretion with or without
> cause**, only subject to the terms of this Agreement.  No
> modification to this provision shall be binding unless
> expressed in writing and signed by the CEO.

*See* Attach. 1 (emphasis added).  At the hearing, Plaintiff's counsel argued that another

section of the contract, Section 4.2, contradicts this provision by providing that the

principal may be terminated for cause at the sole discretion of the CEO.  Plaintiff's

counsel, however, reads Section 4.2 out of context.  Section 4 of the contract is entitled

"Effects of Termination."  The first provision in this section states:

> 4.1    Termination without cause, under Section 3 of this
> Agreement, shall not affect the right of the School
> Principal to receive compensation and benefits for the
> unexpired term of this agreement, to be paid according
> to the terms at the times set forth in this Agreement.

*See id*.  In comparison, as set forth later in Section 4.3, "[t]ermination for cause shall

abolish the Agreement and all rights of the School Principal to receive compensation and

benefits hereunder shall be immediately extinguished."  *See id*. § 4.3.  Clearly, therefore,

Section 4.2 does not contradict the terms of Section 3.1.  Pursuant to Section 3, Plaintiff

held his position as a principal at the will of the CEO and he could be terminated with or

without cause.  Pursuant to Section 4, if terminated with cause, Plaintiff's employment

contract was abolished and he was no longer entitled to compensation and benefits under

the contract.  If terminated without cause, Plaintiff retained his right to compensation and

benefits pursuant to the contract for the unexpired term of the contract.

Plaintiff also seeks to invoke promissory estoppel to modify his at-will

13

employment relationship,[8] but he fails to point to any conduct or statement by his employer promising anything other than an at-will employment relationship. Thus the Court finds that Plaintiff did not enjoy a property interest in continued employment as principal.

Plaintiff also argued at the hearing that he had a protected property interest in his employment contract and that, according to Michigan law, Defendants had to provide him with at least 60 days notice before the termination date of the contract or the contract would be renewed for a one year period. MICH. COMP. LAWS ANN. § 380.1229. According to Plaintiff's counsel, Plaintiff's contract as a principal terminated on June 30, 2001. As Plaintiff contends that he was not informed 60 days before that date that his contract would not be renewed, he claims his contract was renewed through June 30, 2002.[9] But even if Defendants failed to afford Plaintiff 60 days notice prior to their termination of his contract as principal and his contract therefore was renewed for an additional year, the Court's finding that Plaintiff was an at-will employee means that Defendants still could terminate the contract at any time.

### 3.   Tenured Teacher Position

The Court will assume, as Defendants do not attempt to show otherwise, that

---

[8]Promissory estoppel will operate to modify an at-will employment relationship if (1) the employer makes a promise that he reasonably  should have expected the employee to interpret as a commitment from the employer; (2) the employee reasonably relies on the promise to his detriment, which is demonstrated by action or forbearance by the employee based upon the promise; and (3) circumstances exist so that injustice only can be avoided by enforcing the promise. *Price v. Public Serv. Co. of Colorado*, 1 F.2d 1216, 1224 (D. Colo. 1998).

[9]As set forth previously, Plaintiff received a letter stating that he was being terminated as a principal sometime in March 2002.

Plaintiff enjoyed a property interest in his tenured teacher position.  Thus any deprivation of Plaintiff's interest must have been ". . . 'preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  *Relford v. Lexington-Fayette Urban County Govt.*, 390 F.3d 452, 460 (6th Cir. 2004)(quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 1493 (1985)).  As the *Loudermill* Court held, before termination, a public employee with a property interest in continued employment should receive constitutionally adequate procedures, including "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  470 U.S. at 546, 105 S. Ct. at 1495.  The undisputed evidence establishes that Plaintiff in fact received written notice of the charges against him, an explanation of the Board's evidence, and an opportunity to refute the charges. But even so, there is an additional reason why Plaintiff's procedural due process claim fails.

The Supreme Court has held that public employees cannot establish constitutional deprivations of their due process rights "[i]f satisfactory state procedures are provided." *Jefferson v. Jefferson County Public Sch. Sys.*, 360 F.3d 583, 585 (6th Cir. 2004)(citing *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 3203-04 (1984)).  As the Sixth Circuit held in *Vicory v. Walton*, 721 F.2d 1062, 1065-66 (1984), a plaintiff pursuing a Section 1983 claim alleging deprivation of a property interest without procedural due process "must plead and prove that state remedies for redressing the wrong are inadequate."  Plaintiff does not allege in either complaint that the procedures set forth in Michigan's Teacher Tenure Act were inadequate; nor has Plaintiff otherwise set forth any

reason for this Court to find those procedures inadequate.  Plaintiff's failure to demonstrate that the state procedures were inadequate– even if he alleges that he was coerced to retire and forego those procedures– defeats his claim.  *Jefferson*, 360 F.3d at 587-89 (upholding summary judgment on tenured teacher's procedural due process claim where teacher claimed she was forced to retire rather than pursue collective bargaining grievance procedures where she failed to demonstrate inadequacy of those procedures); *see also Relford*, 390 F.3d at 460 (finding no due process violation where notice and opportunity to be heard provided, even though the plaintiff resigned before a hearing date was established).

### B.    Violation of Plaintiff's Substantive Due Process Rights

The Fourteenth Amendment's Due Process Clause prohibits infringement of an individual's property and liberty interests without proper procedural protections.  As the Supreme Court has found, the "Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267 (1997).  In a long line of cases, the Court has delineated rights that are so fundamental as to be afforded substantive due process protection.  *Id.* (cases cited therein).  Those rights include issues involving marriage, family, procreation, and the right to bodily integrity.  *Id.*  These are rights the Court has deemed to qualify as "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'"  *Id.* at 720-21, 117 S. Ct. at 2268 (internal quotations omitted).  The Supreme

16

Court "ha[s] always been reluctant to expand the concept of substantive due process . . ." *Id.* at 720, 117 S. Ct. at 2267 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068 (1986)).

Plaintiff fails to identify any case law holding (or even suggesting) that an individual has a *fundamental* liberty interest in his or her name and reputation.  Plaintiff is correct that courts routinely hold that individuals have a liberty interest in their name and reputation– albeit only when they have suffered some additional injury such as termination of government employment– of which they cannot be deprived absent procedural due process.  *See Quinn*, *supra; Paul v. Davis*, 424 U.S. 693, 708-09, 96 S. Ct. 1155, 1162-63 (1976).  In *Paul v. Davis*, however, the Supreme Court explicitly found no fundamental liberty interest violated by the defendants' dissemination of defamatory, non-private information about the plaintiff.[10]  424 U.S. at 713-14, 96 S. Ct. at  1166.  The Court therefore concludes that Plaintiff's substantive due process claim fails as a matter of law.

C.    **Violation of Plaintiff's Liberty Interest**

---

[10]While the Supreme Court's subsequent decisions in *Whalen v. Roe*, 429 U.S. 589, 97 S. Ct. 869 (1977), and *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S. Ct. 277 (1977), acknowledged that the Fourteenth Amendment constitutional right to privacy may encompass an individual's interest in avoiding disclosure of *personal* matters, the Court explained that in such cases the individual right to privacy must be balanced against the public's interest and need for the invasion.  Thus in *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1061 (6th Cir. 1998), the court balanced the plaintiff's and public's interests to find substantive due process violations in a case where the city disseminated private information contained in undercover police officers' personnel files.  That information included the officers' addresses and phone numbers, names, phone numbers, and addresses of the officers' family members, the officers' personal banking information, and the officers' answers to questioning regarding their personal life.  *Id.*  Here, the information disseminated was not private information.  In any event, the Court believes the public's interest in the information would outweigh any privacy interest.

Plaintiff alleges that Defendants deprived him of his liberty interest in his good name and reputation. This claim fails for the same reasons discussed *supra* with respect to Plaintiff's procedural due process claim.

### D.    Retaliation in Violation of Plaintiff's First Amendment Rights

As the Sixth Circuit has noted, "[i]t is well established that a government employer cannot 'condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000)(quoting *Connick v. Meyers*, 461 U.S. 138, 142, 103 S. Ct. 1684, 1687 (1983)). The Supreme Court has established a three-pronged test to determine whether such a First Amendment retaliatory discharge has occurred. *Id.* Under this test, commonly referred to as the *Pickering* test, the plaintiff must demonstrate that:

> (1) the speech involved a matter of public concern, *see Connick*, 461 U.S. at 143, 103 S. Ct. 1684; (2) the interest of the employee 'as a citizen in commenting upon matters of public concern,' outweighs the employer's interest in 'promoting the efficiency of the public services it performs through its employees,' *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L.Ed.2d 811 (1968); and (3) the speech was a substantial or motivating factor in the denial of the benefit that was sought. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L.Ed.2d 471 (1977).

*Perry*, 209 F.3d at 604. If the employee satisfies this test, he has established a prima facie case of retaliatory discharge.

Plaintiff claims that he spoke out against Dr. Burnley's administration at a meeting of Detroit Public School principals in May 2001. Plaintiff, however, has never identified the specific statements he made at the meeting except to state generally that he made

comments "concerning [Detroit Public School] reforms."  *See* Pl.'s Resp. at 38.  Thus the

Court cannot decide that Plaintiff in fact spoke on a matter of public concern.  But even

assuming that Plaintiff's comments were about a matter of public concern, Plaintiff also

fails to establish the last prong of his prima facie case.

Plaintiff offers no evidence to suggest that his alleged statements at the May 2001

meeting were a substantial or motivating (or even *a* factor) in the Board's decision to

initiate an audit, ultimately terminate Plaintiff as a principal, and/or pursue charges with

the Teacher Tenure Commission.  Contrary to Plaintiff's argument, he cannot satisfy his

prima facie case merely by stating that his speech was a motivating factor in his

discharge.  He must present some evidence to support this allegation. *See Liberty Lobby*,

477 U.S. at 252, 106 S. Ct. at 2512 (holding that once movant establishes the absence of a

genuine issue of fact, the non-movant must present sufficient evidence upon which a jury

could reasonably find for the non-movant).  Not only does Plaintiff fail to present such

evidence, the Court finds no evidence in the record to support his allegation.  In fact, as

Defendants note, the investigation into Plaintiff's alleged misappropriations of school

funds and property began in March 2001, well before he allegedly spoke at the principals'

meeting.

### E.      Violation of Article I, Section 17 of the Michigan Constitution

Article I, Section 17 of the Michigan Constitution provides:

> No person shall be compelled in any criminal case to be a
> witness against himself, nor be deprived of life, liberty or
> property, without due process of law.  The right of all
> individuals, firms, corporations and voluntary associations to
> fair and just treatment in the course of legislative and

19

executive investigations and hearings shall not be infringed.

MICH. CONST. art I, § 17.  In his complaint, Plaintiff alleges that Defendants breached

their duty under this section's "fair and just treatment" clause "by conducting a flawed,

biased, subjective, inaccurate, or otherwise unfair investigation when it carried out a so

called internal audit of Plaintiff's position."  *See* Compl. ¶ 91. At the hearing, Plaintiff's

counsel explained that his client was not treated fairly or justly in the audit process

because Defendants failed to comply with one of the eight points of the school district's

audit process, as listed in exhibit 6 to Plaintiff's response brief.

In their motion for summary judgment, Defendants contend that the Michigan

Constitution's "fair and just treatment" clause does not apply to the Board's audit. It is

not clear to the Court whether Defendants are arguing that the "fair and just treatment"

clause does not apply to this case because Defendants believe the Board is not an

executive or legislative body or because they believe the audit did not constitute an

investigation or hearing.

With respect to Defendants' first possible argument, the cases they cite do not

support a finding that the Board is not part of the legislative or executive branch.  In fact

in *Jo-Dan v. Detroit Board of Education*, No. 201406, 2000 WL 33416896, at *7 n.5

(Mich. Ct. App. 2000)(unpublished opinion), the court assumed without deciding that the

Board was part of the executive branch.[11] As the *Jo-Dan* court noted, the Michigan Court

of Appeals previously held that "school board members are the elective executive

---

[11]The court avoided ruling on this issue because the Detroit Board of Education did not
raise it in support of its motion for summary disposition.

20

officials of their level of government." *Id.* (citing *Nalepa v. Plymouth-Canton Sch. Dist.*, 207 Mich. App. 580, 587-88, 525 N.W.2d 897 (1994)).  The *Jo-Dan* court additionally noted the Michigan Court of Appeals' decisions in *Board of Education of City of Detroit v. Elliott*,[12] where the court held that a "school district is commonly regarded as a state agency," and *Straus v. Governor*,[13] where the court held that "[a] state agency is generally considered a part of the executive branch of government." *Id.*  As to Defendants' second possible argument, they fail to set forth any case law or arguments suggesting that the internal audit did not constitute an investigation.

But even if the "fair and just treatment" clause applies in this case, Plaintiff fails to present any evidence to raise a genuine issue as to whether he was treated fairly and justly.  He fails to present any evidence to support his assertion that the auditors were biased against him, that they were not objective in their review, or that their findings were inaccurate.  The eight point audit process to which Plaintiff refers was attached to a Detroit Public School Memorandum, dated July 31, 2001, announcing a routine audit of Trombley for the period July 1, 1999 through June 30, 2001.  Defendants argue that the audit referred to in the July 31, 2001 Memorandum was a routine financial audit performed with respect to every single school in the district, not the special audit with respect to Plaintiff's activities.  According to Defendants, the eight point process was not applicable to the special audit of Plaintiff's financial activities.

---

[12] 319 Mich. 436, 449-50, 29 N.W.2d 902 (1947).

[13] 230 Mich. App. 222, 231, 583 N.W.2d 520 (1998).

Moreover, Plaintiff complains that Defendants failed to comply with the fifth step of the process requiring an "Exit Conference."  According to the July 31, 2001 Memorandum, "[t]he Exit Conference is the end of the audit process where the Draft Audit Report is discussed . . .[and] the Administrator's concurrence and/or disagreement with audit findings and conclusions is noted."  There is no dispute that the school district's auditors met with Plaintiff and his counsel after the draft audit report was complete and noted his disagreement with the audit findings and conclusions.  Thus the Court finds that Defendants, regardless of whether they in fact were required to do so, complied with this step in the audit process.

### F.    Defamation

The elements of a cause of action for defamation are: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.  *Burden v. Elias Bros. Big Boy Rest.*, 240 Mich. App. 723, 726, 613 N.W.2d 378, 381 (2000).  Defendants seek summary judgment with respect to Plaintiff's defamation claim, contending that any statement concerning Plaintiff constituted a privileged publication.  Specifically, Defendants assert that the "shared interest" privilege applies to any of their statements.

The Michigan courts have defined the "shared interest" privilege as "extend[ing] to all bona fide communications concerning any subject matter in which a party has an interest or a duty owed to a person sharing a corresponding interest or duty.  The privilege

embraces not only legal duties but also moral and social obligations." *Rosenboom v. Vanek*, 182 Mich. App. 113, 117, 451 N.W.2d 520, 522 (1989)(citing *Harrison v. Arrow Metal Prod., Corp.*, 20 Mich. App. 590, 611-12, 174 N.W.2d 875 (1969)).  Defendants argue that the privilege applies to their alleged statements to the Detroit News revealing the findings in the audit report that Plaintiff misused Trombly funds and equipment.  This Court agrees.  There can be no dispute that the Board maintains an interest in the way their administrators and employees handle school district funds and equipment.  There also can be no dispute that taxpayers within the school district maintain an interest in any misuse or mishandling of their tax dollars.  Clearly the communications implicate legal, moral, and/or social interests that are held by Defendants and the community in general.

Plaintiff argues that the shared interest privilege does not apply because the statements were furnished to the Detroit News by a person whose job it was to conduct audits, not release such findings to the public, and because the release was unauthorized. Plaintiff, however, has not cited a single case where a court found that an agency held an interest in a subject matter but declined to apply the privilege based on who in the agency actually disseminated the information.  The Court cannot find any rationale for basing the application of the privilege on such a distinction and thus finds no merit to Plaintiff's argument.  Plaintiff also presents no case law to support his claim that the publication was unprivileged because its release was unauthorized.  In any event, Plaintiff merely speculates that the person who disseminated the information to the Detroit News was someone responsible only for audits and that he or she released the information without authorization.

Where a qualified privilege exists, the plaintiff must show by clear and convincing evidence that the alleged defamatory statements were made with actual malice. *Kefgen v. Davis*, 241 Mich. App. 611, 625, 617 N.W.2d 351 (2000). "Actual malice" is defined as actual knowledge of the information's falsity or in reckless disregard for the accuracy of the information. *Id.* at 624, 617 N.W.2d 351 (citations omitted). "'Ill will, spite or even hatred, standing alone, do not amount to actual malice.'" *Id.* (quoting *Ireland v. Edwards*, 230 Mich. App. 607, 622, 584 N.W.2d 632 (1998)). The plaintiff carries the burden of bringing forth specific evidence, as opposed to general allegations, to show the defendant acted with actual malice. *Postill v. Booth Newspapers, Inc.*, 118 Mich. App. 608, 624, 325 N.W.2d 511, 518 (1982).

Plaintiff states in general terms that Defendants published false, inaccurate, and stigmatizing statements. While Plaintiff claims the audit team started with a presumption of wrongdoing and found the documents to support this argument, *see* Pl.'s Resp. at 37, this appears to be pure speculation on Plaintiff's part as he presents no evidence to support his assertion. It also is pure speculation on Plaintiff's part to assume malicious intentions merely because the release allegedly was unauthorized (and again, Plaintiff fails to present evidence establishing that the release in fact was unauthorized). In short, Plaintiff fails to provide any specific evidence to show that Defendants acted with actual malice.

## G.   Intentional Infliction of Emotional Distress

A plaintiff must establish the following four elements to show a prima facie case of intentional infliction of emotional distress: (1) "extreme and outrageous" conduct; (2)

24

intent or recklessness; (3) causation; and (4) severe emotional distress.  *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 595, 374 N.W.2d 905, 908 (1985).  Liability is found "only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Johnson v. Wayne County*, 213 Mich. App. 143, 161, 540 N.W.2d 66, 74 (1991)(citation omitted).  Defendants claim that no reasonable trier of fact could find their alleged conduct extreme and outrageous. Furthermore, Defendants argue Plaintiff's claim is barred by Michigan's governmental immunity statute.[14]

The section of Michigan's Governmental Tort Liability Act cited by Defendants provides:

> Except as otherwise provided in this act,[15] a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function.  Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which

---

[14]While Defendants contend that Plaintiff's claims against the Board, Dr. Burnley, and Dr. Sheffield are barred pursuant to Michigan's governmental immunity statute, Defendants only discuss one subsection of the statute which applies to governmental agencies, such as the Board. Different subsections of the statute address the immunity of officers and employees*, see* MICH. COMP. LAWS ANN. § 691.1407(2), and the elective or highest appointive executive official of all levels of government. *See* MICH. COMP. LAWS ANN. § 691.1407(5).

[15]The Act sets forth five statutory exceptions to governmental immunity: the highway exception, MICH. COMP. LAWS ANN. § 691.1402; the motor vehicle exception, MICH. COMP. LAWS ANN. §691.1405; the public building exception, MICH. COMP. LAWS ANN. § 691.1406; the proprietary function exception, MICH. COMP. LAWS ANN. § 691.1413; and, the government hospital exception, MICH. COMP. LAWS ANN. § 691.1407(4).  These exceptions are narrowly construed.  *Maskery v. Bd. of Regents of Univ. of Mich.*, 468 Mich. 609, 664 N.W.2d 165 (2003).  None of these exceptions apply in the present case.

immunity is affirmed.

MICH. COMP. LAWS ANN. § 691.1407(1).  The Act defines a "governmental agency" as

the state or a political subdivision.  MICH. COMP. LAWS ANN. § 691.1401(d).  The term

"political subdivision" encompasses, *inter alia*, "a. . . school district . . .or an agency,

department, court, board, or council of a political subdivision."  MICH. COMP. LAWS

ANN. § 691.1401(b).  The Detroit Public School District's Board therefore is a

governmental agency entitled to immunity if it was engaged in the exercise or discharge

of a governmental function.

The Act defines a "governmental function" as "an activity that is expressly or

impliedly mandated or authorized by constitution, statute, local charter or ordinance, or

other law."  MICH. COMP. LAWS ANN. § 691.1401(f); *Ross v. Consumers Power Co.*,

420 Mich. 567, 620, 363 N.W.2d 641, 661-54 (1984).  The Michigan Supreme Court

conversely explained in *Ross*, "[w]henever a governmental agency engages in an activity

which is not expressly or impliedly mandated or authorized by constitution, statute, or

other law (i.e. an *ultra vires* activity), it is not engaging in the exercise or discharge of a

governmental function."  *Ross*, 420 Mich. at 620, 363 N.W.2d at 661 (emphasis in

original).  In a subsequent decision, the Michigan Supreme Court advised that in

determining whether a governmental agency was engaged in the exercise or discharge of

a governmental function, courts should focus on the activity in which the agency was

engaged, not on how well the agency exercised or discharged its authority.  *Richardson v.

Jackson County*, 432 Mich. 377, 386-87, 443 N.W.2d 105, 108 (1989).  As the court

explained: "Improper performance of an activity authorized by law is, despite its

26

impropriety, still 'authorized' within the meaning of the *Ross* governmental function

test." *Id.* at 385, 443 N.W.2d at 108.  In determining whether an activity constitutes a

governmental function, the Michigan Supreme Court also has advised that the term is to

be broadly construed.  *Maskery v. Bd. of Regents of Univ. of Mich.*, 468 Mich. 609, 614,

664 N.W.2d 165, 167 (2003).

The Michigan Courts routinely find the operation of a public school system, as

well as various public school activities, within the scope of a school district's

governmental functions.  *See, e.g., Stringwell v. Ann Arbor Public Sch. Dist.*, 262 Mich.

App. 709, 712, 686 N.W.2d 825, 827 (2004)(holding that the operation of a public school

is a governmental function, but finding a question of fact as to whether statute's motor

vehicle exception applied where student was injured in automotive repair class); *Cobb v.

Fox*, 113 Mich. App. 249, 317 N.W.2d 583 (1982)(finding operation and maintenance of

school bus system to be a governmental function); *Grames v. King*, 123 Mich. App. 573,

332 N.W.2d 615 (1983)(finding that planning and carrying out of extra curricular sports

program is governmental function); *see also Doe ex. rel. Doe v. Warren Consol. Sch.*, 307

F. Supp. 2d 860, 874-75 (E.D. Mich. 2003)(finding school district immune under

Michigan's Governmental Tort Liability Act from the plaintiffs' gross negligence claims

based on sexual molestation of students by elementary school teacher).  While

Defendants do not cite any cases finding the disciplining of school administrators (i.e.

principals) or conducting of internal audits to be governmental functions of a school

district, there can be no doubt that both acts constitute activities expressly or impliedly

delegated to public school districts and their school boards.  Thus the Court finds that the

Board is entitled to absolute immunity pursuant to Section 691.1407(1) with respect to Plaintiff's intentional infliction of emotional distress claim.

Section 691.1407(5) of Michigan's Governmental Tort Liability Act provides: "A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority."  MICH. COMP. LAWS ANN. § 691.1407(5)  Dr. Burnley, as the Board's Chief Executive Officer, is the elective or highest appointive executive official of the Board. Therefore the Court finds that Dr. Burnley also is entitled to immunity from Plaintiff's tort claim.  With respect to Dr. Sheffield, however, it is not apparent from the record whether her position falls within subsection 5.

In any event, it is clear that Dr. Sheffield is entitled to immunity pursuant to Section 691.1407(2).  This subsection provides:

> Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment . . . if all of the following are met:
>
> (a) The officer, employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.
>
> (c) The officer's, employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

MICH. COMP. LAWS ANN. § 691.1407(2).  The conduct alleged by Plaintiff with respect to Dr. Sheffield was conduct she performed within the scope of her authority as the Detroit Public School's Chief of Staff.  As discussed above, the Board was engaged in the exercise of a governmental function.  Finally, as will be addressed below, Dr. Sheffield's conduct did not amount to gross negligence that was the proximate cause of Plaintiff's injury or damage.

In his response, Plaintiff argues that Defendants are not entitled to governmental immunity because they engaged in grossly negligent conduct. The statute in fact provides that officers and employees of a governmental agency are not shielded from tort liability when their conduct constitutes gross negligence or willful misconduct.  MICH. COMP. LAWS ANN. § 691.1407(c).  But while the gross negligence exception to the governmental immunity statute applies to individuals, it does not apply to governmental agencies.  *Gracey v. Wayne County Clerk*, 213 Mich. App. 412, 420, 540 N.W.2d 710, 714 (1995)(citing MICH. COMP. LAWS ANN. § 691.1407(2)), overruled on other grounds in *Am. Transmissions, Inc. v. Attorney Gen.*, 454 Mich. 135, 560 N.W.2d 50 (1997).  As to the individual defendants, however, the Court finds that Plaintiff fails to show that they engaged in gross negligence or willful misconduct.

The statute defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  *Id*.  The statute further requires that the individual's gross negligence be "*the* proximate cause of the [plaintiff's] injury or damage."  MICH. COMP. LAWS ANN. § 690.1407(2) (emphasis added).  The Michigan Supreme Court has held that the legislature's use of the definite article "the" indicates that

29

the term "is best understood as meaning the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 462 Mich. 439, 458-59, 613 N.W.2d 307, 317 (2000)(overruling *Dedes v. Asch*, 446 Mich. 99, 521 N.W.2d 488 (1984)); *see also Doe ex. rel. Doe*, 307 F. Supp.2d at 875.  Not only does Plaintiff fail to show that Dr. Burnley and Dr. Sheffield engaged in grossly negligent or willful misconduct, he also fails to show that their conduct was "the" cause of his injury or damage.

The only conduct by Dr. Sheffield described by Plaintiff is her authoring of two letters sent to him.  The first letter, sent after the audit was concluded, advised Plaintiff of the January 18, 2002 hearing regarding disciplinary charges brought against him as principal.  *See* Defs.' Mot. Ex. 30.  Dr. Sheffield did not attend the hearing and there is no evidence suggesting that she was involved in Mr. Lister's subsequent recommendation to Dr. Burnley that Plaintiff be terminated as principal.  *See id*. Ex. 31.  Dr. Sheffield sent a second letter to Plaintiff in March 2002, advising him that the school district would be deciding whether to pursue charges against him as a tenured teacher at a hearing on April 4, 2002.  *See id*. Ex. 32.  There is no evidence that Dr. Sheffield had any further involvement in the Board's decision to proceed with the charges.  The only conduct by Dr. Burnley described by Plaintiff is Dr. Burnley's adoption of Mr. Lister's recommendation to terminate Plaintiff as principal.  *See id*. Ex. 31.  It does not appear that Dr. Burnley otherwise was involved in the alleged misconduct in Plaintiff's complaints.

Based on this conduct alone– even if the Court concluded that Dr. Burnley and Dr. Sheffield were not entitled to immunity– the Court would find that they are entitled to

summary judgment with respect to Plaintiff's intentional infliction of emotional distress claim. The primary conduct about which Plaintiff complains in this count is the audit of Trombly and the investigation into his activities. Yet Plaintiff presents no evidence that Dr. Burnley or Dr. Sheffield was engaged in any way in these activities. The Court therefore concludes that no reasonable jury could find the actions of Dr. Burnley and Dr. Sheffield alleged by Plaintiff to be extreme or outrageous.

### H.    Constructive Discharge

In this count, Plaintiff alleges he was constructively discharged from his tenured teacher position because Defendants charged him with criminal conduct which they knew had no merit. In order to prove that he was constructively discharged, Plaintiff must show that Defendants deliberately created intolerable working conditions, as perceived by a reasonable person, and that Defendants intended for Plaintiff to resign. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005)(citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001)). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* Whether a reasonable person would have felt compelled to resign depends on the facts of each case, but the Sixth Circuit has advised courts to consider the following factors as relevant:

> "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [younger] supervisor [or supervisor of the opposite sex]; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the

31

employee's former status."

*Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)). Plaintiff's constructive discharge claim fails because he has not presented any evidence to show that he was subjected to intolerable working conditions.

Except possibly for the sixth factor, none of the factors set forth in *Logan* were present with respect to Plaintiff's position as a tenured teacher. In other words, the conditions of Plaintiff's employment as a teacher had not been changed in any way; Defendants merely informed Plaintiff that the Board was pursuing charges against him with the Teacher Tenure Commission which could lead to his dismissal. The Sixth Circuit has found that a defendant's initiation of charges against a plaintiff which could have resulted in the plaintiff's termination will not, on its own, establish the existence of intolerable working conditions, particularly where state law ensured that the plaintiff only could be dismissed after receiving notice and an opportunity to challenge the charges and after an independent body found the charges to be legitimate. *See Driggers v. City of Owensboro*, No. 02-6527, 110 Fed. Appx. 499 (6th Cir. Aug. 24, 2004)(unpublished opinion); *see also Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331 (7th Cir. 2004)(holding that a plaintiff cannot claim constructive discharge based on the school district's notification of referral to tenure review process- raising the prospect of being terminated at the end of the term– when the plaintiff voluntarily chose not to pursue her rights under that process and instead elected to resign); *Summit v. S-B Power Tool, (Skil Corp.), A Div. of Emerson Elec. Co.*, 121 F.3d 416, 421 (8th Cir. 1997)(holding that "an employee's being told that he or she will be fired for cause does not, in and of itself,

32

constitute constructive discharge.")

In *Driggers*, a female police officer filed a lawsuit against the city and her former supervisors after she voluntarily resigned from the force alleging violation of her First Amendment right of intimate association and sex discrimination and retaliation. 110 Fed. Appx. at 501. In support of her sex discrimination claim, the plaintiff alleged that she suffered an adverse employment action in the form of a constructive discharge. *Id.* at 506. Specifically, the plaintiff claimed the city attorney told her she would be charged with numerous counts of misconduct unless she resigned, there were 15 witnesses who could testify against her, and she could be subject to termination as a result of the charges if she did not resign. 110 Fed. Appx. at 506-07. The Sixth Circuit held that even if the defendants intended the plaintiff to resign from the force, she "cannot prove the other necessary element of a constructive discharge– that the employer deliberately created intolerable working conditions as perceived by the reasonable employee." *Id.* at 507.

In reaching this conclusion the court assumed the city attorney told the plaintiff charges would be brought against her if she did not resign that could lead to her termination and that there were numerous witnesses who would testify against her, but concluded that this evidence alone was insufficient to establish a constructive discharge because state law provided the plaintiff with a right to due process and an objective assessment of the charges before she could be dismissed or disciplined. *Id.* The court explained:

> It does not follow . . . that Driggers' only alternative at that
> point was to resign. Although her prospect of avoiding some
> form of discipline appeared to be nil, it was speculative for

33

> her to conclude that the inevitable result of disciplinary
> charges before the City Commission would be her
> termination.  By state law, Driggers could not be dismissed or
> disciplined without first, the formal filing of charges against
> her; and second, a hearing before the City Commission, which
> would have had to decide whether Driggers was guilty of the
> charged misconduct and then impose the appropriate penalty.

*Id.*  In other words, in light of the plaintiff's right to due process under state law, the court

concluded that "a reasonable jury could not infer from Driggers' meeting with [the city

attorney] that she had no alternative but to quit the force and sue."  *Id.* (citing *Summit*,

121 F.3d at 421 (8th Cir. 1997)(finding that "[t]o act reasonably, an employee has an

obligation not to assume the worst and not to jump to conclusions too quickly.  An

employee who quits without giving his employer a reasonable chance to work out a

problem has not been constructively discharged."))

As in *Driggers*, this Court concludes that no reasonable jury could infer that

Plaintiff was subjected to intolerable working conditions merely because the Board

informed him that it was pursuing charges against him with the Teacher Tenure

Commission.  No reasonably jury could conclude that Plaintiff had no alternative but to

quit.  Accordingly, the Court holds that Plaintiff's constructive discharge claim fails.

### I.      Wrongful Discharge

Plaintiff claims he was wrongfully discharged from his position as principal based

on an inaccurate audit report.  As Plaintiff served as a principal in an at-will capacity,

however, this claim must fail.  In order to establish a claim for wrongful discharge, the

employee must establish an employment relationship pursuant to which he only could be

terminated for cause.  *Rasch v. East Jordan*, 141 Mich. App. 336, 340-41, 367 N.W.2d

856 (1985).  As set forth previously, Plaintiff has not presented any evidence to show that he was anything but an at-will employee with respect to his position as principal.

To the extent Plaintiff alleges he was wrongfully discharged from his tenured teaching position, this claim fails because Plaintiff was not discharged.  Plaintiff voluntarily resigned from this position.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is **GRANTED**.

_____
s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Benjamin Whitfield, Jr.
Anthony Adams
Jerome R. Watson

*ATTACHMENT* *P o P*

## DETROIT PUBLIC SCHOOLS
## EMPLOYMENT AGREEMENT
### School Principal

This Employment Agreement (hereinafter "Agreement" or "Contract") is entered into this 15th day of December, 2000. The purpose of this Agreement is to set forth the terms and conditions of employment for **Williams, Freddie** (hereinafter "School Principal"). This Agreement is entered into between the School District of the City of Detroit (hereinafter "the District") and the School Principal and shall become effective only after the approval of the District's Chief Executive Officer (hereinafter "CEO").

## I

### QUALIFICATIONS

1.1   This Agreement is for professional services with the present assignment being School Principal of **Trombly Alternative HS**. This assignment is subject to change at the will of the CEO or his/her designee with such notice to the Administrator deemed appropriate by the District and/or required by law.

1.2   The School Principal represents that he/she possesses the necessary certification and qualifications to hold the present position. Failure to hold, or misrepresentation of, the required certification and qualifications is cause for immediate dismissal of the School Principal.

## II

### TERM OF EMPLOYMENT

2.1   The District hereby employs the School Principal for a term, beginning on **July 1, 2000** and ending on June 30, 2001, subject to the express direction of the CEO or his/her designee.

## III

### AT WILL EMPLOYMENT

3.1.   The School Principal, subject to the terms of this Agreement and applicable Michigan law, serves at the pleasure of the CEO. The CEO may terminate this Agreement, at his/her sole discretion with or without cause, only subject to the terms of this Agreement. No modification to this provision shall be binding unless expressed in writing and signed by the CEO.

## IV

### EFFECTS OF TERMINATION

4.1   Termination without cause, under Section 3 of this Agreement, shall not affect the right of the School Principal to receive compensation and benefits for the unexpired term of this agreement, to be paid according to the terms at the times set forth in this Agreement.

1

4.2   The School Principal may be terminated for cause at the sole discretion of the CEO. Actions constituting cause shall be defined exclusively by the CEO, including, but not limited to, violations of Work Rules and District policies and procedures. Though this list is not intended to be exhaustive, for purposes of this Agreement only, the following conduct may constitute cause for termination:

1.   Unsatisfactory performance, including but not limited to the failure to make satisfactory progress toward implementing performance expectations;
2.   Neglect of duty;
3.   Insubordination;
4.   Misconduct in office;
5.   Violation of law;
6.   Embezzlement or other misuse of the administrative position for personal gain or benefit;
7.   Falsification of records;
8.   Fraud;
9.   Working under the influence of intoxicants or controlled substances not legally prescribed;
10.  Inability to perform the duties and responsibilities of the job;
11.  Failure to cooperate in a legal or quasi-legal proceeding.

4.3   Termination for cause shall abolish the Agreement and all rights of the School Principal to receive compensation and benefits hereunder shall be immediately extinguished.

4.4   Termination of the Administrator, whether with or without cause, shall not be considered to terminate the School Principal's duties under Section 11, Confidentiality, of this Agreement.

## V

## RESPONSIBILITIES

5.1   The responsibilities of the School Principal shall be established by the CEO, and/or any individual or committee specifically designated that authority by the CEO, in writing. The responsibilities of the School Principal may include additional, alternative, revised or reassigned duties and responsibilities within the sole discretion of the CEO and/or his designee. The School Principal shall receive a written copy of his duties and responsibilities.

5.2   The School Principal shall follow the directions of the CEO and/or Supervisor in performing the Principal's assigned duties and responsibilities.

5.3   The School Principal's title or classification shall not prevent the CEO and/or Supervisor from reassigning or otherwise revising the School Principal's duties or responsibilities while this Agreement is in effect.

2

# VI

## LIABILITY

6.1   In the event that a lawsuit or other legal or quasi-legal action is filed against the School Principal for actions taken by him/her in his/her administrative capacity for the District, the District shall provide legal representation, indemnify, settle or compromise any claim, action or judgment against the Administrator, provided that:

1. A copy of the Complaint and Summons or other relevant legal papers is transmitted to the Office of the General Counsel after service upon the defendant School Principal;

2. Pursuant to District investigation and determination, the defendant School Principal was acting consistent with and within the scope of his/her proper administrative duties and responsibilities and with in his/her official representative capacity as a District School Principal;

3. Pursuant to District investigation and determination, such School Principal has acted in full accord with District policy and procedure in carrying out functions which give rise to the legal action; and

4. There has been no illegality or criminality on the part of the School Principal.

6.2   The District shall not represent or indemnify the School Principal if he/she is charged with criminal or illegal activity engaged in during the course of employment.

6.3   When complaints or charges against a School Principal are made, the School Principal shall be given full information with respect thereto. If the School Principal is required to answer said complaint or charge in a non-District administrative proceeding, he/she shall have the right to be represented by the District at every step of the proceeding, to the extent the District determines the School Principal was acting within his/her administrative capacity and scope of employment.

# VII

## MEETINGS

7.   The parties agree that the School Principal shall attend appropriate professional and community meetings as required by the CEO and/or his/her designee. Reimbursement for expenses shall be consistent with the District's policy regarding administrative employee travel reimbursement.

# VIII

## SALARY

8.   The School Principal shall receive a total salary of $ 93,895.00 for the 2000-2001 school year or prorated according to the applicable pay period for the 2000-2001 school year.

3

## IX

## FRINGE BENEFITS

9.      While this Agreement is in effect, the School Principal is entitled to fringe benefits based on District policy.

## X

## MEMBERSHIP

10.     The School Principal's membership in outside organizations is permissible, provided that such memberships are in compliance with applicable Michigan law on conflict of interest, District policies on conflict of interest and ethics and, where appropriate, federal law and regulations. The School Principal hereby agrees to inform the CEO and/or Supervisor of membership in any outside organizations and to immediately inform the CEO and/or Supervisor of any potential or actual conflict of interest.

## XI

## CONFIDENTIALITY

11.1    The School Principal understands that during the course of his/her employment he/she will have access to confidential information or material and is responsible for its security at all times. Generally, School Principal shall not discuss or disclose confidential information with others, except as directed by the CEO. This provision does not prohibit the disclosure or discussion of information to the public that is routinely made available by a public entity.

11.2    The Principal's duty under this provision shall not be terminated by his/her termination, voluntary or otherwise.

## XII

## CONFLICT OF INTEREST

12.     The School Principal is subject to all conflict of interest and ethic policies of the District.

## XIII

## OTHER EMPLOYEE REQUIREMENTS

13.1    The School Principal must meet all medical requirements of the District.

13.2    The School Principal agrees to be subject to all drug testing requirements of the District.

13.3    The School Principal must comply with all policies, procedures and Work Rules of the District.

13.4    The School Principal agrees to participate and assist in lawsuits or other legal or quasi-legal proceedings, which arise out of circumstances or conditions existing during his/her tenure with

4

the District as School Principal. In the event that the School Principal is required to so participate or assist, he/she will be paid reasonable travel expenses.

## XIV

## NOTICE

14.1   All required notices must be made in writing and will be deemed received when delivered personally or by registered mail or certified mail, return receipt requested, addressed as follows:

Deputy CEO, Human Resources                School Principal
Detroit Public Schools
5057 Woodward Avenue - Rm. 404            _____
Detroit, Michigan 48202                          _____
                                                          _____

14.2   Any changes of the notice address must be in writing and must be delivered according to Section 14.1.

## XV

## DEFAULT

15.   Failure by the School Principal to comply with any of the terms of this Agreement may be considered a default of this Agreement. Default of this Agreement may be grounds for cause termination of employment.

## XVI

## APPLICABLE LAW AND FORUM

16.1   This Agreement shall be governed by, and is subject to, all applicable laws of the State of Michigan, rules and regulations of the State Board of Education, and rules and regulations of the School District of the City of Detroit, all of which are made a part of the terms and conditions of this Agreement as though set forth herein.

16.2   Any dispute arising out of this Agreement or any civil rights discrimination claim, including those based upon race, national origin, sex (and sexual harassment), religion, disability, height or weight shall be subject to final and binding arbitration.

## XVII

## SEVERABILITY

17.   The parties agree that in the event any provision or statement in this Agreement is determined to be invalid by a court of competent jurisdiction, the remaining provisions or statements of this Agreement shall remain intact an in full effect.

## XVIII

### ENTIRE AGREEMENT

18.    The parties expressly agree that this is their entire Agreement.  All prior oral or written agreements, covenants or understandings between the parties are incorporated in this Agreement.

## XIX

### AMENDMENTS

19.    Amendments, modifications or other changes to this Agreement can only be accomplished by a written document signed by both parties.

## XX

### TITLES AND HEADINGS

20.    Titles and headings are inserted in the Agreement for reference purposes only and must not be used to interpret this Agreement.

IN WITNESS WHEREOF, the Chief Executive Officer of the Detroit Public Schools hereby enters into Agreement with the above referenced School Principal as of the date shown.

SCHOOL PRINCIPAL

Dated: _12/18/00_

SCHOOL DISTRICT OF THE CITY OF DETROIT

Dated:_____          By:_____

Kay Royster, Ed.D.
Deputy CEO and
Chief Academic Officer

Approved By:

Dated:_____          _____

Kenneth S. Burnley, Ph.D.
Chief Executive Officer

Approved as to form by:_____

Office of the General Counsel

6